Brad H. Bearnson (#3633)
Wayne K. Caldwell (#9466)
Aaron K. Bergman (#13147)
BEARNSON & CALDWELL, LLC
399 North Main, Suite 270
Logan, Utah 84321
Telephone: (435)752-6300
Facsimile: (435)752-6301
Email: bbearnson@bearnsonlaw.com;
Email: wcaldwell@bearnsonlaw.com;
Email: abergman@bearnsonlaw.com
*For emails, please cc:* mandreasen@bearnsonlaw.com
*Attorneys for Plaintiff*

---

IN THE DISTRICT COURT OF THE FIRST JUDICIAL DISTRICT
COUNTY OF CACHE, STATE OF UTAH

| | |
|---|---|
| ICON HEALTH & FITNESS, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CONSUMERAFFAIRS.COM, INC., a Nevada corporation; CONSUMERS UNIFIED, LLC, a Nevada limited liability company; and DAVID ZACHARIAH CARMAN, an individual,<br><br>Defendants. | **FIRST AMENDED COMPLAINT AND JURY DEMAND**<br><br><br>Civil No. 1:16-cv-00168-DBP<br><br>Judge:  Dustin B. Pead |

COMES NOW Plaintiff, ICON HEALTH & FITNESS, INC. (hereinafter "ICON"), by and through its counsel, Brad H. Bearnson and Aaron K. Bergman of the law firm of Bearnson & Caldwell, LLC, and hereby complains against Defendants, CONSUMERAFFAIRS.COM, INC., CONSUMERS UNIFIED, LLC, and DAVID ZACHARIAH CARMAN as follows:

## NATURE OF THE CASE

1.    This is a civil action seeking damages and injunctive relief. Defendants have damaged and continue to damage ICON and its reputation through a concerted scheme of (1) extorting manufacturers by and through (2) misleading the public with a purposefully contrived and self-manipulated  "consumer review" website that presents itself as being objective, truthful, and representative of actual expert review analysis and unbiased consumer input.

## PARTIES

2.    ICON is a Delaware corporation, and is the largest manufacturer of exercise equipment in the world. ICON started in Logan, Utah, where it remains headquartered. ICON is the owner of such well known trademarks as NordicTrack, iFIT, ALTRA, PRO-FORM and FREEMOTION.   ICON produces, manufacturers, markets, and ships its products worldwide. Originating from two college classmates in 1977, they began planning a business. By the 1980s, ICON introduced folding treadmills, an innovation that revolutionized the use of at-home fitness equipment. ICON remains committed to empowering its customers with more active, balanced lifestyles by grounding its products in science, biomechanics, research, ease of use, safety, and technology.  Recent awards have included:

- 2016 Golf Digest Editor's Choice Award (Free Motion Fitness Dual Cable Cross)

- 2016 Consumer Reports Recommended Buy Award (NordicTrack Commercial 1750 and NordicTrack C1650)

- 2016 Consumer Reports Best Buy (NordicTrack Elite 9700 Pro and NordicTrack 790 Pro).

- 2016 Consumer Reports Best Buy (Pro-Form 9000 Pro)

- Product Partners with Le Tour de France (Pro-Form)

- Product Partners with the Boston Marathon (Pro-Form)

- Utah Genius Awards recognizing ICON as being one of Utah's Top 20 Companies with the most patents issued in 2016, with a total of 272 patents and 726 registered trademarks being filed with the U.S. Patent and Trademark Office.

3. ICON has consistently worked for four (4) decades to provide the public with quality fitness products, and has established itself, and its brands and trademarks, as a respected giant in the fitness equipment industry.

4. Defendant ConsumerAffairs.com, Inc. ("ConsumerAffairs"), is a Nevada corporation; Consumers Unified, LLC ("Consumers Unified"), a Nevada limited liability company; and David Zachariah Carman ("Carman"), an individual who is the sole Manager of Consumers Unified and the President, sole Director, Secretary and Treasurer of ConsumerAffairs. Carmen acquired these companies in 2010.

5. The business model presented by Carman, ConsumerAffairs, and Consumers Unified to the public is in fact a scheme, whereby these three, acting in concert, extort businesses by putting forth to the public a distorted Buyers Guide, brand review, and Overall Satisfaction Rating. The end result upon consumers, as set forth below, is deceit and confusion. The end result upon businesses, as set forth below, is loss in excessive setup and monthly fees by way of Defendants' extortion.

6.      Defendants actions constitute a real, present and ongoing danger and damage to Plaintiff and other businesses within interstate commerce.

## GENERAL ALLEGATIONS

**Defendants are Content Creators and Developers**

7.      When a consumer goes to consumeraffairs.com, he or she is presented with a link on the home page that prominently states "View **<u>our</u>** buyers guides" as well as "**Written by experts**, reviewed by consumers" (emphasis added).

## View our buyers guides

Written by experts, reviewed by consumers.

8.      On clicking the above link, the consumer is taken to the next page, which contains a laundry list of consumer products, with this language prominently displayed on top:

# Buyers Guides

Use our expert buyers guides to research your next big purchase.

### Research by Category

9.      Consumeraffairs.com states loudly and clearly that these are "**our expert buyers guides**." Furthermore, rather than review a buyer guide, consumers are invited to "**Research**" the buyer guides (emphasis added).

10.      On information and belief, Defendants, and not the consumers, create these Buyers Guides.

11.      In selecting a Buyers Guide, the consumer can scroll down to the following specific and designated hyperlink: Fitness Equipment

**First Amended Complaint and Jury Demand**
ICON v. ConsumerAffairs.com, Inc., et al.
Page 4

12.     On clicking the above hyperlink, a consumer is brought to the following page, entitled on the uppermost part of the page "**Top 11 Best Rated Treadmills**":



13.     For each, the Complaint shows that these brands fall under a "Best Rated" group or subset. Under each brand, there is a prominent *star rating*.

14.     Upon information and belief, this star rating is the "brand rating," the "Overall Satisfaction Rating," and is a simplified representation of Defendants' overall "Buyer's Guide." Under information and belief, Defendants develop and create this *star rating*.

15.     Besides each *star rating* there is a solid, *pronounced line*.

16.     Under information and belief, this line indicates to consumers that the *star rating*, which is created and or developed by Defendants, is separate and apart from the "Reviews." As set forth in more detail below, Defendants lead consumers to believe that unlike the *star rating*, the "Reviews" are not created or developed by Defendants.

17.     Upon information and belief, a consumer would reasonably conclude that he or she is viewing a rating "written by experts" at ConsumerAffairs.

**Deceptive Statements to the Public**

18.     In 2014, ConsumerAffairs was censured by the ERSP, a division of the Council of Better Business Bureaus, for failing to adequately disclose to the Public the relationship between ConsumerAffairs and Consumers Unified who contracts with its paying "accredited members." Notwithstanding the ESRP censure, Defendants continue to deceive and mislead the public.

19.     Defendants market the following about their "accredited" members:

> In exchange for a monthly fee, we provide ConsumerAffairs Accredited companies with certain information regarding consumer reviews and complaints and allow ConsumerAffairs Accredited companies to respond privately or publicly to the consumer.

20.     Defendants, however, simultaneously represent to consumers that neutrality is maintained as to (1) how reviews are collected and posted, and (2) Defendants' creation and development of their "Buyers Guide," "brand rating," and "Overall Satisfaction Rating" (*supra*).

    a.      "Knowledge is power!"

    b.      "ConsumerAffairs is a **neutral third party site that facilitates open communication** between consumers and brands."

    c.      "There's **no favoritism** to our methods of review collection."

    d.      "We conduct review collection to help gather a broader sampling of **unbiased feedback** as often as possible."

    e.      "Instead of focusing on only one side of the story, **we work with brands to collect ALL customer experiences.**"

    f.      "**Authenticity and verifiable reviews are of the highest importance** to our team, so working to verify reviewers and their stories, regardless of the star-rating, allow us to **give our audience the most balanced and authentic version** of what they could expect when choosing to purchase from the brands they're researching at our site."

    g.      ". . . ConsumerAffairs **never changes star ratings at a company's request** . . . ."

    h.      "**We don't write reviews**, nor do we allow our partner brands to write reviews. Why is this important? First, because consumers trust each other more than any other source of information, including expert reviews. Second, because **we never create review content**, consumers can be confident they're getting the unvarnished opinions and experiences of their peers."

21.    For purposes of this First Amended Complaint, we will refer to these statements by Defendants, and others that Defendants make about themselves to the public, as "Marketing Statements." Defendants use these statements to advertise.

22.    Defendants neutrality, however, is false.

23.    A business that concedes to paying Defendants can have Defendants do the following: update reviews, remove star ratings, and entirely block the text of reviews. The ability to make these changes is extremely valuable for businesses in protecting their brands. These protective measures provided by Defendants exclusively to businesses that pay Defendants are intentionally not disclosed to the public.

24.    Defendants further fail to provide any information on consumeraffairs.com about the existence of Consumers Unified, instead indicating to consumers that "ConsumerAffairs for Brands" is a service offered by Consumer Affairs itself.

25.    Defendants tacitly acknowledge their potential to manipulate data, and their propensity and willingness to do so:

> While ConsumerAffairs never changes star ratings at a company's request, a consumer may choose to change a star rating after resolving a complaint, and this *could* increase a company's overall star rating.

Upon information and belief, Defendants, rather than consumers are responsible for changes in a business "star ratings" as posted on Defendants' website.

26.    For instance, the rating for NordicTrack as of July 26, 2017 shows a relatively positive score of almost four (4) stars, based on 376 reviews.

NordicTrack Treadmills

★★★★☆  |  READ 376 REVIEWS

_ℐ⧸ NordɪcTrack_

27.     Similarly for Pro-Form, as of July 26, 2017 Defendants have given Pro-Form a solid four (4) stars, based on 104 reviews.



28.     However, when ICON first filed its original Complaint (prior to this First Amended Complaint), Defendants' brand rating of NordicTrack was a dismal one star, based on 222 reviews. The same negative review was apparent for Pro-Form.



29.     Consumer opinion of ICON's brands did not, in this short period of time, make an about-face. Rather, under information and belief, Defendants made that change.

30.     In addition, Defendants do not objectively and comprehensively gather reviews.

31.     When the original Complaint was filed, the reviews "collected" by Defendants regarding ICON's brands were so numerous and severely negative that there is no way such a collection could be the result of a legitimate effort by Defendants to obtain "ALL" customer

experiences, especially when contrasted against ICON's generally positive reviews elsewhere, *supra* at 2. Defendants' blatant and obvious effort was to focus and collect negative reviews.

32.     While difficult to discern without discovery from Defendants, resources are available to 'look back' and see what websites used to look like on a given day or range of days. Between September 22, 2015 and January 27, 2016, the first 90 reviews or three pages of reviews, the totality that can be found at this time, show that NordicTrack had 87 out of 90, or 96.6%, pervasively negative reviews.

33.     Upon information and belief, Defendants do not get "both sides" and do not "work with brands" to collect "ALL" customer experiences.

34.     As another example of Defendants' blatant involvement, the sole "Member Accredited" Fitness Equipment brand, YOWZA Fitness, is rated at nearly 5 stars. When a person clicks to see the reviews for YOWZA Fitness, the first three reviews, including "[t]he product is amazing and it's the best equipment ever," and other similar glowing recommendations, are dated out of order on July 12, 2016, April 8, 2016, and last of all on October 20, 2016. For YOWZA Fitness, a consumer has to scroll down the page roughly three times to find a less favorable review, and even then, the rest of the purported **686 reviews** are of a positive nature.

35.     Contrast ConsumerAffairs's rating these brands with ConsumerReports.org, a nonprofit organization with over 6-million users. ConsumerReports.org makes its money from charging consumers, engages in no outside advertising, and independently tests products utilizing applicable industry experts. In stark contrast to ICON's previous one star rating on ConsumerAffairs.com, on ConsumerReports.org the Pro-Form Pro 2000 and the NordicTrack C1650 receive a perfect score (85) and a near perfect score (83), ranking as the two most

recommended treadmills out of the folding treadmill category. Further contrary to its five star rating on ConsumerAffairs.com, YOWZA Fitness does not even make the list of recommended treadmills.

36.     Nor does YOWZA appear on the list of recommended "budget" folding treadmills, where again ICON takes the show at having the NordicTrack C970 Pro, the NordicTrack C990, the Pro-Form Sport 7.5, and the Pro-Form Power 995i at 3rd 5th 7th and 15th place, respectively. Of the 20 treadmills in the market reviewed and "recommended" by ConsumerReports.org, five (5) of them, or 25% are ICON treadmills. None are from YOWZA Fitness.

37.     Under information and belief, some if not many of the 686 positive reviews for YOWZA are fabricated, and do not exist or have been made by Defendants to look as if they apply to YOWZA. Furthermore, under information and belief, Defendants utilize their computer resources in order to deliberately puff the reputation of those companies, like YOWZA, who pay Defendants, by which these businesses obtain a "brand rating" created by Defendants.

38.     As another example, late in 2014, Jitterbug experienced a seemingly magical ratings transformation on ConsumerAffairs.com, after joining Defendants as the first and only cellular "accredited member." Over a ten year period between December 2006 and January 2015, Jitterbug had never received a positive 4 or 5 star rating on any reviews posted on ConsumerAffairs. However, in the eight month period between January 22, 2015 and August 18, 2015, Jitterbug's overall brand rating was transformed to nearly 5 full stars, with negative ratings not only removed from the overall brand rating, but from ConsumerAffairs.com entirely.

Contrary to Defendant's claims of impartiality, this demonstrates that a positive ratings miracle on Defendants' website is just an expensive monthly membership fee away.

### Defendants are Confusing the Public

39.     Defendants intentionally engage in nuanced, unfavorable descriptions that degrade nonpaying companies.

40.     At the time of the original Complaint, a Google Search for "NordicTrack Reviews" produces this on the first page of each search:

> **Top 222 Complaints and Reviews about NordicTrack**
> https://www.consumeraffairs.com › Fitness Equipment ▼
> ★★★★★ Rating: 1.2 - 45 votes
> I purchased the **NordicTrack** Incline Trainer x9i via **Nordictrack**.com on July 3, 2015. I paid for the .
> How do I know I can trust these **reviews** about **NordicTrack?**

41.     The posting gives a false, contrived description of ICON's brand. First, the posting blatantly suggests that there are "222 Complaints and Reviews" that when aggregated led to a one star review. In reality, Defendants generated the rating, from a subset of 45 reviews, with Defendants not disclosing the methods used to select those reviews, which a consumer will not discover unless he clicks on the actual reviews (either from Google or the Buyer's Guide as featured above. Then, in very tiny non-emphasized print, underneath Defendants' star rating is an explanation: "**Based on 45 ratings out of 222 reviews**."



42.     Further, the heading on ConsumerAffairs.com internet review pages for ICON (a non-paying company) is "Complaints and Reviews." In contrast, the heading on ConsumerAffairs.com internet review pages for paying companies is "Reviews and Complaints."

43.     ConsumerAffairs creates an even more misleading turn of phrase in search engine results. When consumers do internet searches containing a brand name or search for reviews of a brand name listed on the ConsumerAffairs website, non-paying brands produce search engine results that state "Top [number] Complaints and Reviews about [brand name]." If the brand has paid ConsumerAffairs their demanded lucrative fees, the search engine results specify "Top [number] Reviews and Complaints about [brand name]."

44.     Only review pages of non-paying members contain a superimposed screen prompt on every page saying "Not Impressed With [non-paying brand]? Find a company you can trust," or "Consumer Recommended [paying brand]," Research top [Industry Product] recommendations on ConsumerAffairs," with a link to "Compare Top Alternatives" or "Compare Companies." Instead, superimposed on each paying member review page is a link to "Request more Information." None of these things are readily ascertainable by online consumers.

45.     No less confusing is Defendants purported endorsement and feature on New York Times, CNN, Forbes, AARP, NBC News, and the Washington Post. These popular news outlets do not endorse Defendants.

46.     Similarly, Defendants confusingly state on their "About" page "Our in-house research team works closely with industry experts to write our comprehensive buyers guides and how-to articles." No such affiliation actually exists between Defendants, Defendants' employees,

and "industry experts." Further, in Defendants' frequently asked questions they state: "We do not write or create reviews."

47.     This confusion has been ongoing, and continues to date. For instance, when a consumer finally clicks to "Read 376 Reviews" on NordicTrack, the consumer for the first time is shown the contrived nature of the overall brand rating. Rather than being a product of consumer reviews, it is based upon Defendants' own contrived "Buyers Guide" selection of 167 out of 376 reviews:



48.     Similarly, when a consumer clicks to "Read 104 Reviews" about Pro-Form, the consumer for the first time is shown the contrived nature of the overall brand rating, being in actuality based upon Defendants' "Buyers Guide" selection of 74 reviews.

49.     Notwithstanding, because of Defendants' Marketing Statements, consumers are led to believe that Defendants' Buyer's Guide, as displayed on ConsumerAffairs.com, is the product of neutral third party analysis. The truth of the matter, however, is that consumers have nothing to do with Defendants' "Buyer's Guide," "brand rating," or "Overall Satisfaction Rating." It is a contrived fiction made by Defendants.

50.     No less than 75% of consumers believe it is important to look to other consumer reviews in determining whether to purchase a given product. As such, Defendants' deceptively and confusingly state on their blog website, and market to the public:

> We don't write reviews, nor do we allow our partner brands to write reviews. Why is that important? First, because consumers trust each other more than any other source of information, including expert reviews. Second, because we never create review content, consumers can be confident that they're getting the unvarnished opinions and experiences of their peers.

**Intentional Degradation of Reputation in Furtherance of Extortion**

51.     Defendants publish their "Overall Satisfaction  Rating" or "Brand Rating" or "Buyer's Guide" rating, all the same, which is a star rating of 1-5 stars. As explained above, while Defendants claim neutrality in developing and creating this information, and in their third party inclusion of "ALL" reviews, the ratings and reviews are in reality a contrived tool.

52.     An overall positive internet consumer-based review, whether real or fabricated to look real, remains a powerful marketing tool in today's age. Whether real or fabricated, the reviews posted and the overall ratings given have a strong impact on consumer decisions.

53.     Conversely, an overall negative internet consumer-based review, whether real or fabricated to look real, has an equally strong impact upon consumer decisions.

54.      In addition to contriving positive reviews for paying companies, Defendants also purposefully contrive negative reviews for non-paying companies targeted by Defendant.

55.     In ICON's case, Defendants benefitted and or intended to benefit from the activities of Sales Account Executive Emily Burke, and other relevant employees of Defendants in carrying out the scheme alleged herein. Specifically, Emily Burke began a series of "cold call"

solicitations to ICON's Director of e-Commerce, Travis Cox, emphasizing the number of "unique views" relating to NordicTrack and Pro-Form on ConsumerAffairs.com , and pointed out the corresponding low brand rating for ICON's brands as well as the pervasively negative reviews posted alongside each brand rating.

56.     Defendants offered to be the solution, but would not disclose their pricing or means of solution. Defendants demanded ICON sign a Non-Disclosure Agreement before seeing this information. By March of 2016, ICON had not signed and Emily Burke responded by providing even more analytics relating to views of ICON's brands, showing 8,900 total views with a purported average viewing time of 23 minutes, just for "NordicTrack." By May 2016, ICON had still not signed the Non-Disclosure Agreement or responded further to ConsumerAffairs' tactics, and Emily Burke emailed again stating "[i]t has been two months and I think we could really help your business."

57.     In July of 2016, Emily Burke emailed again and tacitly threatened ICON with the following information: "I thought I'd give you your stats on your two brand profiles." Regarding NordicTrack Ms. Burke listed "53K + views in the last year" and for Pro-Form "24K + page views in the last year." Further, Defendants tacitly threatened that ConsumerAffairs.com rated on page 1 of all major search engines, for no less than seventy-five (75) prominent search terms directly related to ICON's brands.

58.     On July 27, 2016, Mr. Cox emailed back stating "[o]ur legal team won't sign the NDA [Non-Disclosure Agreement] just to see pricing as they feel that shouldn't be a trade secret."

59.     On August 5, 2016, Burke sent ICON a "Member Accreditation Agreement" (the "MAA"), noting a $9,000.00 setup fee and an ongoing $3,000 per month fee for Defendants' deceptive "services." The MAA clearly provides that in contrast to non-paying companies, ICON could, through Defendants, remove all negative feedback disputed, and that any SEO / Marketing Plan would not be implemented until ICON's rating exceeds 3.5 stars.[1] In other words Defendants, at ICON's request, would manipulate the reviews in ICON's favor and keep ICON off the grid (so to speak) until ICON's rating was manipulated.

60.     Defendants further suggested that if ICON did not sign the MMA, Defendants' ratings for NordicTrack and Pro-Form would stay at their manipulated one-star level the negative reviews would remain unchanged.

61.     Defendants represent to the public that its brand ratings are the product of independent expertise, stating they have verified "609,949 reviews" and include only those that come through the ConsumerAffairs.com website. Further, they "ensure our reviewers are real," use "intelligent software that helps us maintain the integrity of reviews" and "moderators read all reviews to verify quality and helpfulness."[2]

62.     These statements are false. There are reviews posted about ICON's brands that are dated prior to when ConsumerAffairs was in existence. Defendants do not verify the authenticity of reviews, require contact information for reviews, actually moderate reviews prior to inclusion or exclusion and do not have any independent expertise upon which the brand ratings are based.

---

[1] "SEO" stands for Search Engine Optimization, which generally speaking is the utilization of techniques and strategies to obtain a high ranking SERP, or Search Engine Page Placement.
[2] https://www.consumeraffairs.com/health/nordic-track.html (accessed 10-24-2016)

63.     During the course of communications with Burke, ICON felt as if it had no choice and asked for materials necessary to go forward with Defendants' offer. ICON felt compelled by the negative posted review history, the impact of the lack of positive reviews, the bad overall brand rating, and Defendants' ultimate control over that information as used for Defendants' own desires. As answered by Defendants to a consumer who asked why a repaired review had not been corrected:

> First of all, when you file a review, you give us a non-exclusive right to **use it as we see fit**, as clearly stated in our terms of use. We are under no obligation to remove it.

ICON was legitimately concerned and in fear that if it did not capitulate, it would not have the power to correct Defendants' false perceptions of ICON.

64.     The MMA identified Consumers Unified as the contracting party and stated that Consumers Unified would transform ICON's poor brand rating image into a more favorable rating.

65.     On information and belief, the MMA is part of the business model developed by Defendants. The new business model sells memberships to companies like ICON to "transform" their online image. Carman has generally spoken about introducing this business model in an interview with a Tulsa, Oklahoma newspaper. Nowhere, however, does the website disclose Consumers Unified, or its involvement in Defendants' overall scheme.

66.     ICON declined to execute the MMA or enter into a business relationship with the Defendants.

67.     Defendants' tactics are damaging companies such as ICON and mislead consumers.

**First Amended Complaint and Jury Demand**
ICON v. ConsumerAffairs.com, Inc., et al.
Page 18

68.     ICON, other consumer product companies and the consumers at large are all being misled and confused by Defendants' scheme.

69.     As a conservative basis, ICON estimates that a total of 9,000 unique views for NordicTrack and 4,500 unique views for Pro-Form take place each month on ConsumerAffairs' website. Defendants' self-attested click-to-conversion rate for each unique page view equates to 1,800 lost NordicTrack customers, and 900 lost Pro-Form customers, each month as they are deceived by Defendants' marketing. Defendants' concerted efforts, over just the last year from when the original Complaint was filed, have cost ICON by Defendants' own admission, no less than ten million, five hundred and thirty thousand dollars ($10,530,000.00).

## FIRST CLAIM FOR RELIEF
### (UTAH COMMERCE AND TRADE)

70.     Plaintiff restates the allegations in paragraphs 1 to 69.

71.     Plaintiff is a person that has suffered and continues to suffer ascertainable losses of money as alleged in paragraph 69 as a proximate result of Defendants' past and ongoing willful use or employment of methods, acts or practices declared unlawful under Title 13 of the Utah Code, as amended.

72.     Under the Unfair Competition Act, U.C.A. sections 13-5a-101, *et. seq.*, Defendants are liable as follows:

(a)     Under section 13-5a-102(4) by engaging in unfair competition. Specifically, through the above explained manipulations, misrepresentations, and biased activities, Defendants have conducted an intentional business act, and continue to conduct such

acts, that are unlawful or fraudulent, which have led to the material diminution of value of ICON's intellectual property.

(b)     Under section 13-5a-102(4), by engaging in "malicious cyber activity" in unlawfully utilizing computer resources to intimidate ICON and other companies, to coerce ICON and other companies, and/or by intentionally or recklessly attempting to defraud or materially cause damage or disruption to the computing resources of ICON and other companies, and the consumers who rely upon them.

73.     Under the Utah Consumer Sales Practices Act, U.C.A. sections 13-11-1 *et. seq.*, the Legislature enacted certain provisions to protect consumers and to protect suppliers such as ICON and others who in good faith comply with the provisions of the Act. Under the Act, Defendants are liable as follows:

(a)     Under section 13-11-4, by indicating that the subject of consumer transactions (the products) have the approval and or disapproval of Defendants' independent experts neutral analysis of ALL reviews. There is no independence, there are no real experts, and there is no genuinely made effort to analyze ALL reviews.

(b)     Under section 13-11-4, by indicating that ICON products are of a lower standard, quality, grade, style, or model, when in fact it is not.

(c)     Under section 13-11-4, by indicating that Defendants have the sponsorship, approval, or affiliation with individuals, persons, and businesses that it does not have. For instance, ConsumerAffairs.com  purports to be sponsored and approved by the New York Times, CNN, Forbes, AARP, NBC News, and the Washington Post.

(d)     Under section 13-11-5, by engaging in an act that violates the Utah Consumers Sales Practices Act, wherein under the circumstances such acts were unconscionable.

74.     Under the Truth in Advertising Act, U.C.A. sections 13-11a-1 *et. seq.*, Defendants have advertised themselves and their services as set forth above in paragraph 20, and are liable as follows:

(a)     Under section 13-11a-3(1)(b), by causing likely confusion or misunderstanding as to the source, sponsorship, and approval of Defendants' reviews, Buyers Guides, brand ratings, and overall satisfaction ratings, and that the same originate with Defendants, not consumers.

(b)     Under section 13-11a-3(1)(c), by causing likely confusion or misunderstanding as to affiliation, connection, and association existing between paying companies and Defendants, marketing that Defendants are serving and advocating for consumers with independence, without bias, and merely facilitating discussion when in fact they are not.

(c)     Under section 13-11a-3(1)(h) by disparaging the goods, services, or business ICON and others by false or misleading representation of fact where Defendants' market themselves as providing  an unbiased, comprehensive selection of reviews, do not engage in review creation, and are not manipulating reviews, and thereby falsely gain the Public's trust and then in a misleading and misrepresentative fashion post categorically negative reviews that pervasively and intensely disparage ICON and its brands and products.

(d)     Under section 13-11a-3(1)(t), by representing to perform an independent comparisons of goods or services manufactured by ICON, and others, when in fact Defendants selection of reviews, its Buyers Guides, its brand rating, and its Overall Satisfaction rating are

not independent and are not the product of unbiased selection, but are in fact manipulated and contrived by Defendants as part of a scheme to deceive the public, to artificially inflate the reputation of some, and to extort the rest.

75.     Defendants, and each of them, have also conspired together and aided and assisted one another in the commission of the unlawful practices alleged above. Without ConsumerAffairs.com, consumers could not be deceived; without Consumers Unified, businesses could not be extorted; and without Carmen at the helm of both, the scheme would not have been implemented nor continue to operate.

76.     Under the Truth in Advertising Act, section 13-11a-4, Plaintiff has a right to a private cause of action, is entitled to an order from the Court enjoining Defendants' illegal practices, is entitled to recover its actual damages, costs, and attorney's fees, and is entitled to an order from the Court ordering Defendants promulgate sufficient corrective advertising in the same distribution, frequency, and veracity in which Defendants have violated the Act.

77.     Under the Unfair Competition Act, section 13-5a-103, ICON has the right to recover its actual damages, costs, attorney's fees, and punitive damages.

78.     As a result of Defendants' above wrongful conduct, Plaintiff has been damaged, the amount of which is to be proven at trial, reserving the right to seek punitive damages pursuant to statute as appropriate, and requesting its costs, fees, and attorney's fees.


## **SECOND CLAIM FOR RELIEF**
### (INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS)

79.     Plaintiff restates the allegations in paragraphs 1 to 78.

80.    Plaintiff had and has a reasonable prospective economic relationship with potential and interested consumers who, according to Defendants' own website analytics, visit ConsumerAffairs' Buyers Guide page for NordicTrack and Pro-Form in the thousands, and spend an average of 23 minutes reviewing the pages therein.

81.    Defendants intentionally interfered with these prospective customers, by way of improper means. Defendants, as set forth above, deceptively gained these customers' trust as one claiming to be a "**neutral third party**" who merely "**facilitates open communication**," engages in "**no favoritism to our methods of review collection**" and works "**with brands to collect ALL customer experiences**," to give "**the most balanced and authentic version**" of a review sampling, and "**never changes star ratings at a company's request** " and certainly "**don't write reviews**," and would "**never create review content**."

82.    Defendants however, as set forth above, do each of these things either to the advantage of paying customers, like YOWZA Fitness, or to the disadvantage of non-paying targeted customers like ICON, who refuse to capitulate to Defendants' tacit threats and demands.

83.    By engaging in the above conduct, Defendants gain the public's and potential customers of ICON's trust, and present these customers with a falsely positive perception of YOWZA Fitness, who directly competes with ICON, and a falsely negative perception of ICON, who refuses to pay for Defendants untruthful services. These actions (1) drive consumers to ICON's competitors, and (2) drive consumers away from ICON and the products under which it markets its brands, like NordicTrack and Pro-Form. As a result, ICON loses these sales.

84.    With ConsumerAffairs' website, consumers are so deceived; with Consumers Unified, businesses are drawn in and the manipulation and creation of false reviews is carried

out; and with Carmen at the helm of both, the scheme was implemented and continues to interfere with ICON's prospective customers.

85.     As a result of Defendants' intentional interference with ICON's prospective economic relations, Plaintiff has and continues to be damaged in an amount to be determined at trial, plus costs, and attorney's fees. Plaintiff reserves the right to amend and allege recovery of punitive damages against one or all Defendants.

## THIRD CLAIM FOR RELIEF
(RICO)

86.     Plaintiff restates the allegations in paragraphs 1 to 85.

87.     Pursuant to 18 U.S.C. § 1964(c), Plaintiff as a legal entity is a person which has been injured in its business or property by reason of a violation of 18 U.S.C. § 1962 (c), (d).

88.     An enterprise existed and continues to exist. ConsumerAffairs runs a website known as ConsumerAffairs.com. ConsumerAffairs works with Consumers Unified, wherein the latter by various means such as cold calls, email, and mail targets businesses in an effort to cause said businesses to become accredited members of ConsumerAffairs. Carmen is in control of both of these businesses; he is the author of the scheme to which the enterprise as a whole adheres to; and on a regular basis Carmen manages and directs the actions of Consumers Unified and ConsumersAffairs in continuation of that scheme.

89.     The activities of the enterprise have affected interstate commerce between Utah, where ICON and its officers and employees were located, Tulsa Oklahoma, where Defendants and Burke are headquartered, and across the nation regarding as of impacted online consumers visit ConsumerAffairs' website.

90.     Burke and Carmen are associated with or employed by the enterprise, and operate with and through ConsumerAffairs and Consumers Unified.

91.     The Defendants, and each of them, conducted (operated and managed) the above alternative enterprises' affairs through a pattern of racketeering activities.   The racketeering activities defined by 18 USC §1961 (1).

## FIRST PREDICATE ACT
### (18 USC § 1343 – WIRE FRAUD COUNT 1)

92.     Defendants engaged in and continue to engage in a scheme or artifice to defraud. In 2010, Carmen developed a scheme to create a website that would gain the Public's trust by marketing itself as a neutral website hosting a forum where third-party consumer reviewers could interact with the businesses to address the contents of those reviews. Despite being censured by the ESRP in 2014, Carmen has created and directed to be implemented the following marketing statements, each of which are of in existence and remain used as of this very date:

a.      "Knowledge is power!"

b.      "ConsumerAffairs is a **neutral third party site that facilitates open communication** between consumers and brands."

b.      "There's **no favoritism to our methods** of review collection."

c.      "We conduct review collection to help gather a broader sampling of **unbiased feedback** as often as possible."

d.      "Instead of focusing on only one side of the story, **we work with brands to collect ALL customer experiences.**"

e.       "Authenticity and verifiable reviews are of the highest importance to our team, so working to verify reviewers and their stories, regardless of the star-rating, allow us to **give our audience the most balanced and authentic version** of what they could expect when choosing to purchase from the brands they're researching at our site."

f.       ". . . ConsumerAffairs **never changes star ratings at a company's request** . . . ."

g.       "**We don't write reviews**, nor do we allow our partner brands to write reviews. Why is this important? First, because consumers trust each other more than any other source of information, including expert reviews. Second, because **we never create review content**, consumers can be confident they're getting the unvarnished opinions and experiences of their peers."

93.     The above marketing statements can be found on ConsumerAffairs.com, on a blog operated and directed by Carmen, and on a Facebook page devoted to the enterprise.

94.     The above statements are intended by the enterprise, or are reasonably calculated by the enterprise to deceive consumers, who are ordinary persons of ordinary prudence or comprehension, into believing that the reviews, scores, Buyers Guides, and Satisfaction Ratings contained on ConsumerAffairs.com are without influence by the enterprise, are expertly fielded and authenticated, and are collected in an unbiased and comprehensive manner. Obviously, Defendants' purpose and intent is to deceive, because absent being perceived as a trustworthy source of information, consumers would not visit ConsumerAffairs.com. And absent consumers visiting ConsumerAffairs.com, Carmen and his enterprise would have no leverage upon which to extort businesses to join his scheme.

95.     Each of the above statements, used in the past and on an ongoing basis, were made with the use of interstate wire communications in facilitation of the scheme. The statements were posted by Defendants onto the worldwide web, were done so on websites directly owned and or operated by Defendants, and were done so in furtherance of attracting and deceiving the public in the trust it could place in Defendants' enterprise.

## SECOND PREDICATE ACT
### (18 USC § 1343 – WIRE FRAUD COUNT 2)

96.     Defendants engaged in and continue to engage in a scheme or artifice to defraud. In 2010, Carmen developed a scheme to create a website that would gain the Public's trust by marketing itself as a neutral website hosting a forum where third-party consumer reviewers could interact with the businesses to address the contents of those reviews. Despite being censured by the ESRP in 2014, Carmen has created and directed to be implemented the following marketing statements, each of which were in existence as late as April 22, 2016 on ConsumerAffairs' About Page: "ConsumerAffairs is a **consumer** news and **advocacy organization** . . . ."

97.     As Carmen states on his December 20, 2015 biography on ConsumerAffairs.com, "[t]hrough our pedigree of fair and balanced reporting, Consumer Affairs can achieve the best outcomes for both brands and customers."

98.     These statements are false, and were intended to deceive the public. While difficult to discern without formal discovery, between September 22, 2015 to January 27, 2016, the first 90 reviews or three pages of reviews as to NordicTrack can be detected showing 87 out of 90, or 96.6% as being pervasively negative.

99.     The above statements are intended by the enterprise, or are reasonably calculated by the enterprise to deceive consumers, who are ordinary persons of ordinary prudence or comprehension, into believing that the reviews, scores, Buyers Guides, and Satisfaction Ratings contained on ConsumerAffairs.com are without influence by the enterprise, are expertly fielded and authenticated, and are collected in an unbiased and comprehensive manner. Obviously, Defendants' purpose and intent is to deceive, because absent being perceived as a trustworthy source of information, consumers would not visit ConsumerAffairs.com. And absent consumers visiting ConsumerAffairs.com, Carmen and his enterprise would have no leverage upon businesses to join the scheme.

100.    Each of the above statements, used in the past and on an ongoing basis, were made with the use of interstate wire communications in facilitation of the scheme. The statements were posted by Defendants onto the worldwide web, were done so on websites directly owned and or operated by Defendants, and were done so in furtherance of attracting and deceiving the public in the trust it could place in Defendants' enterprise.

### THIRD PREDICATE ACT
(18 U.S.C. § 1961 – ACT OR THREAT OF EXTORTION)

101.    Utah Code section 76-6-406 outlaws extortion, and 18 U.S.C. § 1961includes as a racketeering activity any act or threat of extortion.

102.    Under the law, extortion occurs when one "obtains or exercises control over the property of another by extortion and with a purpose to deprive him thereof," and defines extortion as to "[c]ause physical harm in the future to the person threatened or to any other person or to property at any time," or "engage in other conduct constituting a crime," or to

expose a person "to hatred, contempt, or ridicule," or "[d]o any other act which would not in itself substantially benefit [the wrongdoer] but which would harm substantially any other person with respect to that person's . . . business, calling, career, financial condition, reputation, . . . or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt or ridicule."

103.    Working through Sales Account Executive Emily Burke, Defendants attempted to get ICON to pay Defendants. The cold-calling began in the first quarter of 2016, and the formal MMA was given and offered to ICON on August 5, 2016.

104.    Before the cold-calling began, Defendants as set forth supra set out and obtained as many negative reviews regarding ICON's brands as Defendants could find. Defendants also fabricated reviews, altered reviews, and contrived a Buyers Guide, Brand Rating, and Overall Satisfaction Rating applicable to ICON's brands NordicTrack and Pro-Form, and did so as to purposefully reflect a collection of pervasively negative and categorically undesirable reviews and ratings.

105.    Defendants' above actions constituted and were in furtherance of a crime, it being deceitful and misrepresentative of what Defendants had told and marketed to the public regarding Defendants' services.

106.    An overall positive internet consumer-based review, whether real or fabricated to look like the product of actual consumer reviews, remains a powerful marketing tool in today's age. Whether real or fabricated, the <u>reviews posted</u> and the <u>overall rating given</u> have a strong impact on consumer decisions.

107.    Conversely, an overall negative internet consumer-based review, whether real or fabricated to look like the product of consumer reviews, has an equally strong impact upon consumer decisions; in many instances, the impact is even stronger in the case of negative consumer-reviews.

108.    Defendants purposefully contrived negative reviews for ICON, who Defendants had targeted and wished to force into paying Defendants' excessive and unreasonable fees.

109.    Emily Burke without being solicited, and at the direction of Carmen, under the name of Consumers Unified, and with the assistance of information and technology provided by ConsumerAffairs, contacted Director of e-Commerce, Travis Cox, emphasizing the number of "unique views" relating to NordicTrack and Pro-Form on ConsumerAffairs.com , and pointed to the corresponding low brand rating for ICON's brands, as well as the pervasively negative reviews posted alongside each brand rating.

110.    By March of 2016, ICON still held strong, and Emily Burke responded by providing even more analytics relating to views of ICON's brand NordicTrack, showing 8,900 total views with a purported average time of 23 minutes spent on ConsumerAffairs' "NordicTrack" review page per review.

111.    By May 2016, ICON still would not sign and Emily Burke emailed again stating "[i]t has been two months and I think we could really help your business."

112.    In July of 2016, Emily Burke emailed again stating "I thought I'd give you your stats on your two brand profiles." Regarding NordicTrack Ms. Burke listed "53K + views in the last year" and for Pro-Form "24K + page views in the last year." Further, Defendants tacitly

threatened that ConsumerAffairs.com rated on page 1 of all major search engines for no less than seventy-five (75) prominent search terms that directly related to ICON's brands.

113.    On August 5, 2016, Burke sent ICON a "Member Accreditation Agreement" (the "MAA"), which while removing Defendants' exorbitant $9,000.00 setup fee, still required an unreasonably prohibitive $3,000 per month fee for Defendants' "services." Defendants, at ICON's request, were offering to manipulate the reviews in ICON's favor and to keep ICON off of the grid (so to speak) until ICON's rating was sufficiently manipulated.

114.    ICON felt as if it had no choice and asked for materials necessary to go forward with Defendants' offer. Despite the approximate four (4) decades ICON had taken to build its fitness equipment brands to consumers, ICON felt entirely compelled by the negative posted review history, the impact of the lack of positive reviews, the bad overall brand rating, and Defendants' ultimate control over that information as used for Defendants' own desires. As answered by Defendants to a consumer who asked why a repaired review had not been corrected:

> First of all, when you file a review, you give us a non-exclusive right to **use it as we see fit**, as clearly stated in our terms of use. We are under no obligation to remove it.

ICON was legitimately concerned and in fear that it would not have the power to correct Defendants' false perceptions of ICON and its brands absent capitulating to Defendants' demands.

115.    Notwithstanding, upon being informed of all the circumstances, ICON declined to enter the deal. ICON did not believe that Defendants' coercive practices were just or truthful.

116.    Through the above acts, Defendants subjected ICON's brands to hatred, contempt, and ridicule.

117. By performing the above acts, Defendants did not substantially benefit, but these same actions substantially harmed ICON's business, brands, and reputation,  and deprived ICON of a significant number of internet-based consumer referred fitness equipment sales.

118. The effect of Defendants' tactics is not just disparate from what other review outfits have to say about ICON – it is intentionally damaging, leading consumers to obtain a deceptively biased opinion of ICON and its brands and the products associated with such brands.

119. As to each of the above predicate acts, Defendants' scheme utilizes and relies upon interstate commerce. As stated in Defendants' own July 6, 2016 email, "[o]ur brand partners use our services for our SEO, positive brand sentiment in SERP, utilization of ConsumerAffairs platform to resolve issues/retain customers/engage and ultimately acquire new customers that are further in buying [sic] funnel after reading that [sic] engagement and reviews from existing customers." The damaging conduct was also posted by Defendants onto the worldwide web, on websites directly owned and or operated by Defendants, and were done so in furtherance of attracting and deceiving the public, creating a genuine threat to ICON, and in furtherance of the subsequent attempted extortion.

## CONSPIRACY TO RACKETEER
### (18 U.S.C. § 1962 (c) – ALL DEFENDANTS)

120. As explained by Defendant Carman to TulsaWorld on February 14, 2014, ConsumerAffairs and Consumers Unified are by an inseparable enterprise:

> Since the acquisition of the business, we've built a Software-as-a-Service platform that both connects brands directly with consumers [Consumers Unified], as well as helps brands collect more complaints and reviews from their customers [ConsumersAffairs].

121.     Carmen, ConsumerAffairs, and Consumers Unified all agreed to or conspired to pursue the same criminal predicate acts in furtherance of the overall scheme. Carmen intended to further that endeavor, and acted as the 'brain-child' of it; established two entities by which they could operate together to deceive the public and extort target companies; created Software-as-a-Service Platform to facilitate the scheme; and has repeatedly furthered and endorsed the scheme through marketing statements to the public.

122.     ConsumerAffairs and Consumers Unified are co-conspirators to Carmen, being the actual entities Carmen has acted through in accomplishing his scheme, who is the sole Manager of Consumers Unified and the President, sole Director, Secretary and Treasurer of ConsumerAffairs.

## PATTERN OF RACKETEERING

123.     In 2015 Defendants victimized Consumer Cellular, Incorporated, in the same manner as ICON was victimized as set forth above in the predicate acts.

124.     In 2014 UnbeatableSale.com was victimized in the same manner as ICON was victimized as set forth above in the predicate acts.

125.     As of 2017 Diamond Dog Foods is being victimized by Defendants in the same manner as ICON was victimized as set forth above in the predicate acts.

126.     Defendants' false statements to the public, which underlay each of the predicate acts, continue to exist as to predicate offense no. 1, and existed in 2015, 2016, and 2017, and continue to exist in substance as to predicate offenses nos. 2 and 3.

127.     Where Defendant Carmen acts at the helm of both ConsumerAffairs and Consumers Unified; where the scheme of deception and extortion are the business-model of the

enterprise; and where the scheme is continuing to date, there is a pattern of racketeering that has occurred and likely will occur into the future absent this Court's intervention.

128.    As a result of the above, and as set forth *supra*, ICON has been damaged in monetary damages in an amount to be proven at trial, but currently estimated mathematically to be no less than $10,530,000.00;

**FOURTH CLAIM FOR RELIEF**
(DEFAMATION)

129.    Plaintiff restates the allegations in paragraphs 1 to 129.

130.    The Defendants have published and continue to publish false and defamatory representations regarding Plaintiff ICON and its brands.  Between September 22, 2015 to January 27, 2016, the first 90 reviews or three pages of reviews as to NordicTrack can be detected showing 87 out of 90, or 96.6% thereof being pervasively negative. The same severity of negative reviews is apparent as to Pro-Form.

131.    In addition, Defendants contrive a Buyer's Guide, brand rating, and Overall Satisfaction Rating for NordicTrack and Pro-Form brands. These Buyers Guides and ratings were negative at one-half star and one-star – both similarly negative.

132.    The combined effect, namely *hundreds* of extremely negative reviews declaring that ICON is a horrible company, that its products are of inferior quality, and that consumers should stay away to avoid physical harm, mental distress, and wasting their money, along with Defendants' self-contrived low ratings and Buyers Guide, has a definite and discernable injurious effect upon ICON's reputation and the reputation of its brands in the eyes of consumers.

133.     Defendants' publication of those statements was not done for a socially beneficial end, supplanting real competition with Defendants deception and extortion funded scheme.

134.     Defendants' own description or factual basis purportedly substantiating the opinions published and the authenticity thereof, i.e. Defendants' marketing statements regarding its neutral and unbiased collection, non-development, and non-creation of reviews and ratings, Buyers Guides, brand ratings, and Overall Satisfaction Ratings, are, as set forth *supra*, are false.

135.     The statements, both the defamatory opinions and false basis for those opinions, have been and continue to be published to thousands of internet consumer who do internet searches for "NordicTrack," "Pro-Form," "NordicTrack Reviews," or "Pro-Form Reviews," or who click on the ConsumerAffairs.com review page for to see its Buyers Guides.

136.     Defendants and each of them have, as stated above conspired together and materially aided and assisted one another in these past and ongoing defamatory statements.

137.     Defendants and each of them have, as stated above published these written statements maliciously for the purpose of harming ICON and its brands and coercing ICON into paying Defendants with ICON's money.

138.     As a result of Defendants' broad written publications, regarding ICON and its brands NordicTrack and Pro-Form, and the false factual bases for those opinions marketed no less widely, ICON has incurred damages, the amount and quality of which are to be determined at trial.

## **JURY DEMAND**

139.     Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prayers for judgment against Defendants, and each of them, as follows:

(1)     For monetary damages on all claims to be proven at trial, currently estimated at no less than $10,530,000.00;

(2)     For treble damages where permitted;

(3)     For equitable, injunctive, and declaratory relief as the court sees fit;

(4)     For reasonable attorney fees and costs, prejudgment and post judgment interest;

(5)     For all costs and disbursements related to this action.

(6)     For such other relief as the Court deems just and equitable, including without limitation that Defendants cease their actionable practices and reserving the right to amend to allege punitive damages on Plaintiff's claims to the extent not precluded by law.


DATED this 28th day of July, 2017.

BEARNSON & CALDWELL, LLC


*/s/ Aaron K. Bergman*
Brad H. Bearnson
Aaron K. Bergman
*Attorneys for Plaintiff*


**First Amended Complaint and Jury Demand**
ICON v. ConsumerAffairs.com, Inc., et al.
Page 36

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2017, I electronically filed the foregoing **FIRST AMENDED COMPLAINT AND JURY DEMAND** with the Clerk of the Court using the CM/ECF system, with electronic notification from the Court to the following as follows:

Michael C. Mills
BAUMAN LOEWE WITT & MAXWELL, PLLC
3650 N. Rancho Drive, Suite 114
Las Vegas, Nevada  89130
mmills@blwmlawfirm.com

Cameron Stracher
CAMERON STRACHER, ESQ.
4 New York Plaza, 2d Floor
New York, New York  10004
cam@stracherlaw.com

*/s/ Aaron K. Bergman*_____
Brad H. Bearnson
Aaron K. Bergman
*Attorneys for Plaintiff*